UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINA FUGAZI; ALEX GONZALEZ; ANNETTE ZIMMER; FRANCISCO MACIAS; JAMAR C. BERRY; JO A. LAING; BENJAMIN R. HERRERA; DIVINE JANE LEANOS; ELIZABETH LAWRENCE WHITE; MARC LAWRENCE WHITE; KALANI MARSHALL BLACK; TARKDEEP SINGH; TOOBA NAVEED; VALDOMERO LOPEZ,<br><br>    Plaintiffs,<br><br>    v.<br><br>ALEX PADILLA, in his official capacity as Secretary of State for the State of California; MELINDA DUBROFF, in her official capacity of the San Joaquin County Registrar of Voters, and DOES 1 through 50,<br><br>    Defendants. | No.  2:20-CV-00970-KJM-AC<br><br>ORDER |

Plaintiffs move for a temporary restraining order seeking to enjoin the Secretary of State for the State of California and the San Joaquin County Registrar of Voters (collectively "defendants"), from completing the recount of votes for the March 3, 2020 Primary Election and finalizing the election results without including vote-by-mail ballots cast by plaintiff voters who

1

provided signature verifications to the Registrar by April 21, 2020.  The court, having considered the arguments of counsel on May 19, 2020, and the papers submitted with this matter including defendants' surreply filed May 20, 2020, DENIES plaintiffs' motion, without prejudice to plaintiffs' filing a motion for preliminary injunction.

I.      BACKGROUND

     A.      Factual Background and Allegations

          1.      March 3 Presidential Primary: Executive Order Modifies Original Deadlines

Plaintiffs are Christina Fugazi, a candidate to represent California Assembly District 13 in the Primary Election held on March 3, 2020, and thirteen persons registered to vote in San Joaquin County who seek to represent a class of similarly situated voters.  The thirteen voter plaintiffs are Alex Gonzalez, Annette Zimmer, Francisco Macias, Jamar C. Berry, Jo A. Laing, Benjamin R. Herrera, Divine Jane Leanos, Elizabeth Lawrence White, Marc Lawrence White,[1] Kalani Marshall Black,[2] Tarakdeep Singh, Tooba Naveed and Valdomero Lopez (collectively "voter plaintiffs").  Compl. ¶¶ 22–23, ECF No. 1; Mot. TRO, Ex. 1 (Fugazi Decl.) ¶ 1, ECF No. 4-1.

On March 4, 2020, the day after the March 3 Presidential Primary Election, the Governor of California proclaimed a State of Emergency in the state due to the coronavirus (COVID-19) pandemic.[3]  Compl. ¶ 12.  Slightly more than two weeks later, on March 20, 2020,

---

[1] The court notes named plaintiff Marc Lawrence White or Marc Lawrence is not identified on the Registrar's log entitled, "Voters Contacted Due to Initially Challenged Ballot for the Presidential Primary Election on March 3, 2020."  Surreply, ECF No. 23, at 10 & n.4.  Defendants confirm there is a "Marc Eugene Lawrence" registered in the County, and his mail ballot was counted.  Dubroff Suppl. Decl. ¶ 12.  The court does not reach the issue of name disparities for purposes of this motion.

[2] The court also notes named plaintiff Kalani Black, listed as Kalani Marshall Black in the caption, appears to be listed in the Registrar's voter log by the name Kalani Tyson Marshall.  Reply, Ex. 1 (Voter Log), ECF No. 16-1, at 49.

[3] The court notes and takes judicial notice sua sponte of Governor Newsom's March 19, 2020, shelter in place order, available at: https://covid19.ca.gov/img/N-33-20.pdf.

the Governor specifically addressed the effect of COVID-19 on the counting of votes cast in the March 3rd Primary by issuing Executive Order N-34-20.  *Id.*  This Executive Order "[extended] all deadlines associated with completing, auditing, and reporting on the official canvass" by 21 days, to provide relief to California's 58 county elections officials who were in the middle of the official canvass for the March Primary.  *Id.*; *see also* Req. for Judicial Not., Ex. 2 (Executive Order N-34-20 ("Governor's Order")) ¶ 2 at 8, ECF No. 5-1.  In this Order, on the one hand, the Governor urged county elections officials "to complete activities related to the official canvass according to the deadlines ordinarily imposed by state law, to the extent possible."  Governor's Order ¶ 4 at 9.  At the same time, however, the Governor directed that "[e]lections officials shall provide maximum possible notice to voters about how to participate in each of these elections, paying particular attention to the needs of voters at high risk from COVID-19, individuals with disabilities, and other voters with particularized needs."  *Id.* ¶ 3 at 8–9.

Following the Governor's issuance of the March 20 Executive Order, on March 23, 2020, the California Secretary of State issued Memorandum No. 20068, directed to county elections officials regarding compliance with the order, identifying which calendar entries in the Secretary of State's March 3, 2020, Primary Election calendar were extended by the executive order.  Padilla Opp'n, ECF No. 8, at 5; *see also id.*, Ex. C (Sec'y of State's Mem. No. 20068), ECF No. 8, at 22–23 (referencing the Primary Election calendar).

2.   <u>San Joaquin Voter Registrar's Original Election Certification</u>

Prior to the Governor's Order extending the dates by which to complete voter canvasses, the San Joaquin County Registrar of Voters, Melinda Dubroff ("the Registrar"), would have been required to certify her county's election results by April 2, 2020, the 30-day deadline in effect on the primary election date.  Mot. TRO, ECF No. 4, at 5.  After the Governor's Order took effect, the Registrar certified the election on April 5, 2020, as detailed below.

The Registrar's Office, located at 44 N. San Joaquin Street, Ste. 350, in Stockton, California, was closed to the public at some point in light of the statewide state of emergency.  Ms. Fugazi says the Registrar told her the office was closed starting March 23, 2020.  Fugazi Decl. ¶ 2.  The Registrar avers the building in which her office is located closed to the public

1  "[e]ffective April 1."  Dubroff Suppl. Decl. ¶ 10; *see also id*., Ex. B (Public Notice), ECF No. 24-
2  2, at 2 ("Effective April, 2020, the County Administration Building is closed to the public until
3  further notice").  The Registrar says that after her office was closed, her staff remained available
4  to answer incoming calls, including to the phone number, (209) 468-2890, listed in the cure
5  notices sent to voters described below.  Dubroff Suppl. Decl. ¶ 10.

6  At one point the Registrar planned to certify the election results one day later than
7  the original deadline, on Friday, April 3, 2020, but ultimately certified them on Sunday, April 5,
8  2020.  Dubroff Suppl. Decl. ¶ 11.  Plaintiffs allege the Registrar did not provide voters a
9  minimum eight days' notice prior to this certification date, to allow them to cure mismatched
10 signatures or the absence of signatures on ballot envelopes, as required by the California
11 Elections Code.  Mot. TRO at 6; *see also* Cal. Elec. Code § 3019(d)(1).  Eight days prior to April
12 5 was Thursday March 26, 2020.  Dubroff Decl. ¶ 12.

13        3.    <u>Recount Occasioned By Plaintiff Fugazi's Recount Request; Plaintiff Voters Attempt to Cure Signatures During Recount Period</u>

15 On April 14, 2020, Ms. Fugazi requested a recount of the ballots cast for
16 candidates for Assembly District 13.[4]  Fugazi Decl. ¶ 4.  During the course of the recount, on
17 April 21, 2020, approximately, thirty-five vote-by-mail voters submitted[5] their signature

---

[4] Under the recount rules prescribed by the state Elections Code, the requestor of a recount is responsible for the costs associated with carrying the recount out.  Fugazi Decl. ¶ 4.  To date Ms. Fugazi avers she has incurred approximately $115,902 in costs for daily reviews of elections materials.  *Id.* ¶ 7.  The court notes that, while Ms. Fugazi complains that the Registrar has arbitrarily overstated the deposit amounts required, neither the complaint nor the application for a TRO make a legal claim for relief on these grounds.  As of the date of hearing on May 19, 2020, the recount was continuing, meaning Ms. Fugazi had made the required deposits through that date.  While counsel represented the recount currently is anticipated to continue through June 9, if Ms. Fugazi does not make a deposit as required, the recount will cease and the TRO motion may become moot.  At hearing the parties agreed to a stipulation based on defense counsel's representation, that the recount would under no circumstances be completed before next Monday, May 25, 2020.

[5] The complaint pleads that the proposed class "consists of thirty-six (36) voters registered to vote in the San Joaquin County" March 3 election.  Compl. ¶ 36.  Ms. Fugazi's declaration also states, "we have identified thirty-six voters."  Fugazi Decl. ¶ 1.  Plaintiffs' motion for a TRO represents that "approximately, 35 Vote-by-Mail voters submitted their signature verifications to

1   verifications to the Registrar. Mot. TRO at 7. Plaintiffs do not expressly identify which of the
2   voter plaintiffs attempted to cure by April 21, 2020. To date, the Registrar has declined to count
3   the votes of those persons who submitted cure documents, on grounds their verification
4   statements were untimely. Dubroff Opp'n, ECF No. 10, at 12 (citing Elections Code
5   § 3019(e)(C)(1) ("If timely submitted, the elections official shall accept any completed unsigned
6   ballot statement.")).

7   The defendants argue in surreply that the record on the TRO motion should be
8   narrowed to eight plaintiffs to whom the Registrar sent notices on March 11 or March 16, eight
9   and three days, respectively. These dates are after the Governor's executive order declaring a
10  state of emergency and before the Governor's March 19, 2020, shelter in place order took effect,
11  and so fall within the period of time when disruption to the vote-counting process was most
12  likely. Surreply at 9. For purposes of this motion, given the record before, the court accepts this
13  argument and considers the motion as based on the facts with respect to the following voters:

| Voter Plaintiff Name | Date Registrar Mailed Notice |
|---|---|
| Valdomero Lopez | 3/11/2020 |
| Alex Gonzalez | 3/11/2020 |
| Jamar Ceasar Berry | 3/11/2020 |
| Divine Jane Leanos | 3/11/2020 |
| Francisco Daniel Macias | 3/16/2020 |
| Elizabeth Lawrence White | 3/16/2020 |
| Kalani Marshall Black | 3/16/2020 |
| Tooba Naveed | 3/16/2020 |

*Id.* at 9–10.

---

the Registrar by . . . April 21, 2020[.]" Mot. TRO at 7. None of these documents clarifies whether the number 35 or 36 voters includes all the named voter plaintiffs.

5

The only voter on this list to have submitted a declaration in support of the TRO[6] is Valdomero Lopez, who says he "did not receive notice by mail that there was a deficiency in [his] signature" and "never received a phone call from the San Joaquin County Registrar's Office advising [him] of any extension of time granted by the Governor of California to cure [his] vote." Reply, Ex. 7 (Lopez Decl.) ¶¶ 5, 7, ECF No. 16-7.  Moreover, Mr. Lopez explains with the backdrop of COVID-19 he "would not have gone to the Registrar's office because of potential exposure" and he wanted to prevent "bringing it home to his wife who is [suffering from cancer.]"  *Id.* ¶ 6.

During the recount, on April 23, 2020, Ms. Fugazi spoke with the Registrar. While Ms. Fugazi does not quote the Registrar directly, she says the Registrar told her that her "staff [had] identified issues with signature sheets for vote by mail ballots" but "it was now too late to send out mail curing notices and affidavits to voters, so staff made calls." Fugazi Decl. ¶ 1. Fugazi says the Registrar said she was "not sure" if logs were kept of staff calls to voters in an attempt to cure vote by mail signature issues.  *Id*.  In their declarations, two other recount observers also paraphrase a conversation in which they assert the Registrar said, in substance, "there was not enough time to write all voters that needed to cure deficiency in vote by mail signatures and in some instances . . . the Registrar's staff phoned said voters instead." Reply, Ex. 2 (Reiman-Estes Decl.) ¶¶ 4–8, ECF No. 16–2; *id*., Ex. 3 (Estes Decl.) ¶¶ 4–5, ECF No. 16-3.  In surreply, the Registrar states she does not recall making such a comment and counters "to the extent that such a statement was in fact made, it was off-the-cuff and inaccurate as it relates to sending Cure Letters to voters." Dubroff Suppl. Decl. ¶ 13.

On May 15, 2020, while the recount continued, the Registrar discovered that 21 voted ballots had been placed in boxes for unused ballots after the polls had closed on election day.  Reply at 8.  On May 18, 2020, six weeks after certification, the Registrar decided to accept and tabulate these 21 newly discovered ballots.  *Id*.  Registrar does not explain why she opted to count these ballots.

---

[6] To be clear, only one other voter submitted a declaration that does not affect the court's decision here, for additional reasons described below.  *See* note 8 *infra*.

B. Procedural History[7]

On May 12, 2020, plaintiffs filed their complaint against defendants Alex Padilla, Secretary of State for the State of California, and Melinda Dubroff, San Joaquin County Registrar of Voters. Both are sued in their official capacity only. Compl. ¶¶ 6, 8. The court has granted Kathy Miller's request to be joined as a defendant under Federal Rule of Civil Procedure 19(a)(2). *See* Order, ECF No. 22.

Plaintiffs make the following claims: (1) violations of the First and Fourteenth Amendments of the U.S. Constitution; (2) violation of the Voting Rights Act; (3) violation of procedural and substantive due process; and (4) violation of the Americans with Disabilities Act. *See generally* Compl. Plaintiffs ask the court to order the San Joaquin County Registrar of Voters to immediately count the thirty-five voters in California Assembly District 13 of San Joaquin County that voted "before 5:00 p.m. on April 21, 2020," Compl. at 25 (prayer for relief), and to order fair, reasonable and constitutionally sufficient procedures in future 2020 elections to allow plaintiffs and others to safely participate in those elections without concerns over COVID-19. *Id.*

On May 13, 2020, citing urgent circumstances, plaintiffs moved the court to temporarily restrain the Registrar from completing the recount requested by Ms. Fugazi without counting the vote-by-mail voter verifications and signatures that plaintiffs and all other voters submitted by April 21, 2020. *See generally* Mot. TRO. Defendants opposed the motion, ECF Nos. 8–10, and plaintiffs replied, ECF No. 16. On May 19, 2020, the court held a telephonic hearing on the motion, ECF No. 21. As allowed by the court, Melinda Dubroff filed a surreply, ECF No. 23.

---

[7] On April 27, 2020, Ms. Fugazi alone filed a verified petition for writ of mandate and application for temporary restraining order against the same defendants in the San Joaquin County Superior Court, alleging state election law violations. Miller Req. for Judicial Not., Exs. A–B (San Joaquin Superior Court Docs.), ECF No. 12, at 4–39. That court denied plaintiffs' TRO application. *Id.*, Ex. D (May 6, 2020 Sup. Ct. Min. Order) at 46. The voter plaintiffs are not a party to the ongoing state case. Reply at 11. The California Secretary of State also is not a party to the state court filing. *Id.*

7

Plaintiffs' TRO application, on its face, is not a model of clarity in identifying the federal basis on which the motion is brought.  As discussed further below, defendant Dubroff fairly questions in her surreply whether the motion is based on more than alleged violations of state law not cognizable in this federal court.  Although plaintiffs assert at one point the "mere fact that the Registrar chose to mail some individuals notice of her rejection of ballots and their right to cure, and to contact others by telephone, claiming she did not have time to mail them their notices prior to the rushed certification date, constitutes unequal protection," they do so under a heading referencing the "State Constitution."  Mot. TRO at 15.  By their reply, plaintiffs bring a bit more focus to the federal nature of their request here, referencing the federal claims made in their complaint and arguing that this action is "about failed processes that the San Joaquin County Registrar utilized in giving voter plaintiffs an opportunity to cure their votes that were cast in the Presidential Primary Election."  Reply at 2.  Argument at hearing clarified the motion is best construed as based on the third claim in the complaint, and specifically alleged violations of procedural due process rights.

## II.      LEGAL STANDARD

A temporary restraining order may be issued upon a showing "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A).  The analysis for temporary restraining orders and preliminary injunctions is "substantially identical." *Stuhlbarg Int'l. Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  "A preliminary injunction is an extraordinary remedy, never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  In determining whether to issue a preliminary injunction, courts must consider whether the moving party (1) "is likely to succeed on the merits," (2) is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor, and (4) "an injunction is in the public interest."  *Id.* at 20.  The moving party has the burden of proving this extraordinary remedy is warranted by clear and convincing evidence.  *See Mazurek v. Armstrong*, 520 U.S. 958, 972 (1997) ("And what is at issue here is not even a defendant's motion for summary judgment, but a plaintiff's motion for preliminary injunctive relief, as to which the

requirement for substantial proof is much higher."); *see also Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 442 (1974). Although these "shorthand formulations" regarding plaintiff's burden of persuasion "aptly express the courts' general reluctance to impose an interim restraint on defendant before the parties' rights have been adjudicated, they do not take the place of a sound evaluation of the factors relevant to granting relief under Rule 65(a)." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995) (footnotes omitted).

The Ninth Circuit sometimes employs an alternate formulation of the *Winter* test, referred to as the "serious questions" test. *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012). "A preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips strongly in the plaintiff's favor.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (internal quotations omitted) (quoting *Lands Council v. McNair*, 537 F.3d 981, 986–87 (9th Cir. 2008)). Under the "serious questions" approach to a preliminary injunction, the court may use a "sliding scale" where "[t]he elements of the preliminary injunction test must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). *Winter* was decided after the initial articulation of the "serious questions" test but does not overrule it. *Cottrell*, 632 F.3d at 1135. The "serious questions" test must be applied in conjunction with review of the other two *Winter* factors, likelihood of irreparable injury and whether the injunction is in the public interest. *Id.*

III.   LIKELIHOOD OF SUCCESS ON THE MERITS

"The first factor under *Winter* is the most important . . . [b]ecause . . . when a plaintiff has failed to show the likelihood of success on the merits, [the court] need not consider the remaining three [*Winter* elements]." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (last alteration in original) (quotations marks and citations omitted). As explained below, the court finds plaintiffs have not satisfied their burden under the first prong of the *Winter* test, including by raising serious questions, so as to warrant the extraordinary relief of a temporary restraining order; the court thus does not reach the three other prongs of the *Winter* test.

9

A.   Parties' Arguments

Plaintiffs effectively contend, as clarified by their factual arguments at hearing, that they are likely to succeed on the merits of their procedural due process claim on the grounds that the Registrar failed to provide voters with adequate notice of the need to cure their ballots, under the circumstances arising from the COVID-19 pandemic, before she certified the election as required by the California Elections Code. Mot. TRO at 9–10; Reply at 2. Plaintiffs' counsel concedes Executive Order N-34-20 does not require county elections officials to extend their "canvass-related deadlines" by the full 21 days allowed, but rather is permissive. Counsel, however, argued at hearing that the Secretary of State's Memorandum providing the actual dates of the new deadlines is mandatory. But the plain language of the Memorandum undermines this argument; the Memorandum itself simply extends all deadlines associated with the official canvass for "elections officials and the Secretary of State." *See* Sec'y of State's Mem. No. 20068 at 22–23. Rather, the true gist of plaintiffs' argument appears to be that the disruption caused by the onset of the COVID-19 pandemic by early March 2020 impaired the voter plaintiffs' ability to review and follow through on any notice the Registrar provided of their right to cure signature problems with their ballots, such that they should have been given more time to cure. *See* Reply at 4–5. Moreover, for those voters who were able to review the notice, plaintiffs argue the notice itself was deficient because it did not provide the actual date the Registrar planned to certify the election results; rather it only instructed "[t]he signature verification statement must be received by the elections official of the county where you are registered to vote no later than 5 p.m. two days prior to certification of the election." Cal. Elec. Code § 3019(d)(2); *see also* Dubroff Decl., Ex. 1 (Unsigned Ballot Envelope Letter & Signature Verification Letter), ECF No. 11-1, at 1–4. Voters who went to the Registrar's website could not have found additional information to clarify the date by which they had to cure, as the website did not post the date for certification; rather it displayed only an old notice to cure for a past election in 2018. Compl. ¶ 20. Finally, plaintiffs suggest that the experience of one voter in particular, Valdomero Lopez, signals the potential for broader systemic problems with the Registrar's provision of notice during the relevant time

1 period: Mr. Lopez avers he did not receive a mailed notice nor did he receive a phone call from
2 the Registrar. Lopez Decl. ¶¶ 5, 7.[8]

3       Defendants argue plaintiffs are unlikely to succeed on the merits because from
4 February 15, 2020, through March 18, 2020, Registrar Dubroff's office provided 1,585 voters
5 with notice of the opportunity to cure defects in their signatures in accordance with California
6 Elections Code section 3019(d)(1). Dubroff Opp'n at 9; *see* Dubroff Decl. ¶ 10; Dubroff Suppl.
7 Decl. ¶¶ 5, 6 (correcting previous figures regarding number of voters); *see also* Notice of Errata
8 to Dubroff Suppl. Decl., ECF No. 26 (further corrections). Defendant Dubroff argues "San
9 Joaquin County had 31 days to cure their absentee ballots." Surreply at 11–12. Defendants also
10 contend the language of the notice itself complied with state law and provided recipients with all
11 of the information they needed to cure the signature issues with their ballots in a timely manner.
12 Specifically, the notice provided the correct number to call, which was answered at regular hours
13 even after the Registrar's office closed to the public in light of COVID-19. Dubroff Suppl. Decl.
14 ¶ 10. If a voter attempted to return documents in person, the Registrar had set up drop-boxes at
15 the entrances to the building in which her office was located. *See* Surreply at 6. The last date
16 notices were mailed was March 18, 2020, fifteen days after the election, supporting a conclusion
17 voters received the notices within 3 days, by March 21, 2020. *See* Dubroff Decl. ¶¶ 11–12;
18 Surreply at 5 (court can presume Postal Service generally delivers mail within three days). In
19 sum, the Registrar posits that with certification on April 5, the last voters to be sent notices had
20 ten days to cure, more than the eight required.

21       Defendant Dubroff also argues in her surreply that plaintiffs have not identified a
22 federal claim as the basis of their motion for a TRO. Surreply at 10. The court addresses this
23 argument as a threshold matter below, to clarify the basis for its issuance of this order.

---

[8] The court notes plaintiffs also submitted a declaration by Vickie L. Milano. Reply, Ex. F (Milano Decl.), ECF No. 16-6; *see* Voter Log at 53. This declaration does not support plaintiff's motion in light of Ms. Milano's admitting she received cure notice sent by the Registrar, and says only vaguely that she did not have enough time to return it. *Id*. ¶ 5. Ms. Milano is not a named plaintiff in this action.

B. <u>Claim Underlying TRO Request</u>

Defendants' argument that plaintiffs fail to make any argument or provide evidence of any federal claim in their TRO application impliedly invokes the party presentation principle addressed recently by the Supreme Court:

> In our adversarial system of adjudication, we follow the principle of party presentation. As this Court stated in *Greenlaw* v. *United States*, 554 U.S. 237 (2008), 'in both civil and criminal cases, in the first instance and on appeal . . . , we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.' *Id*., at 243. In criminal cases, departures from the party presentation principle have usually occurred 'to protect a *pro se* litigant's rights.' *Id.*, at 244; *see, e.g.*, *Castro v. United States*, 540 U.S. 375, 381–383 (2003) (affirming courts' authority to recast *pro se* litigants' motions to 'avoid an unnecessary dismissal' or 'inappropriately stringent application of formal labeling requirements, or to create a better correspondence between the substance of a *pro se* motion's claim and its underlying legal basis' (citation omitted)). But as a general rule, our system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.' *Id.*, at 386 (Scalia, J., concurring in part and concurring in judgment).
>
> In short: '[C]ourts are essentially passive instruments of government.' *United States* v. *Samuels*, 808 F.2d 1298, 1301 (CA8 1987) (Arnold, J., concurring in denial of reh'g en banc)). They 'do not, or should not, sally forth each day looking for wrongs to right. [They] wait for cases to come to [them], and when [cases arise, courts] normally decide only questions presented by the parties.' *Ibid.*

*United States v. Sineneng-Smith,* No. 19-67, slip op. at 3–4 (U.S. May 7, 2020).

In *Sineneng-Smith*, the criminal defendant argued in the trial court the case against her should be dismissed based on her First Amendment rights of free speech and petition. *Id*. at 3. On appeal, the Ninth Circuit solicited briefs from three amici on a First Amendment overbreadth argument not briefed in the trial court and ultimately adopted the amici's arguments in concluding the federal statute at issue was unconstitutionally overbroad. *Id*. The Supreme Court held the appeals panel had committed an abuse of discretion, as the overbreadth argument on which the case was decided had not been presented by a party to the suit. *Id*.

Unlike in *Sineneng-Smith*, plaintiffs here put the defendants on notice of their federal claims in their complaint and have argued at least a colorable question of procedural due process in their moving papers as clarified in reply and at hearing. Although the court agrees with defendants that the elements of a federal constitutional violation are not spelled out as clearly in the moving papers as they could be, it does not require any particular deductive leap

1  from plaintiffs' factual arguments and evidence to understand the federal due process claim on
2  which they rely, however inartfully.  "A court is not hide-bound by the precise arguments of
3  counsel," *id*. at 8, and the court finds the principle of party presentation is satisfied at least as to
4  that claim.[9] *Id.* (citing Cal. Elec. Code § 3019(d)(2)).

The court also notes that election cases of the type plaintiffs attempt to bring typically turn on substantive due process claims.  *See, e.g.*, *Bennett v. Yoshina*, 140 F.3d 1218, 1224 (9th Cir. 1998) (analyzing substantive due process claim related to election procedure), *as amended on denial of reh'g and reh'g en banc* (June 23, 1998); *Wilkins v. Cty. of Alameda*, 571 F. App'x 621, 623 n.1 (9th Cir. 2014) (characterizing plaintiffs potential substantive due process claim as "coextensive" with his "right-to-vote claim").  But plaintiffs' pleading of their due process claim, while including the word "substantive" in the label, does not incorporate language to suggest a substantive due process claim is actually asserted.  And plaintiffs have made no effort to argue, legally or factually, that the elements of a substantive due process claim are met here and so the court finds such a claim not fairly presented at this time.

C.   Elements of Procedural Due Process Claim

Consistent with the observations made above, plaintiffs plead in their complaint that, "[u]nder the law of the Ninth Circuit, a 42 U.S. Code § 1983 claim alleging a procedural due process denial requires proof of three elements: (1) a deprivation of a constitutionally protected liberty interest; (2) a state action; and (3) constitutionally inadequate process." Compl. ¶ 91; *see Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005) (§ 1983 claim requires state action and procedural due process violation requires "(1) a protectible liberty or property interest . . . and (2) a denial of adequate procedural protections").

---

[9] Plaintiffs do not challenge California Elections Code section 3019's requirement that election officials notify voters of the right to cure "no later than 5 p.m. two days prior to certification of the election," Cal. Elec. Code § 3019(d)(1), without a corresponding requirement to provide the actual date of anticipated certification, *see also id.* § 3019(d)(2) (prescribed form, which does not call for specific date to be plugged in, and which Registrar's notice language tracks exactly).  Because plaintiffs have not presented such a claim to the court, any remedy to a flaw in the statutory language is for the California Legislature to consider.

13

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). The right to vote is a constitutionally protected right. *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) ("Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections."); *see also Duncan v. Poythress*, 657 F.2d 691, 705 (5th Cir. 1981) (holding that one substantive guarantee of due process clause is "the right to be free from the purposeful decision of state officials to deny the citizens of a state the right to vote in an election mandated by law"); *Samuel v. Virgin Islands Joint Bd. of Elections*, No. 2012-0094, 2013 WL 842946, at *5 n.2 (D.V.I. Mar. 7, 2013) ("[t]he right to vote—to the extent it exists and an individual has been deprived of it—is certainly a protected liberty interest" (citation omitted)).

Where "plaintiffs have alleged that they were deprived of a constitutionally-protected [liberty or] property interest as a result of state action, due process is implicated and the question becomes what process is due." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). To answer this question, the Supreme Court has directed courts to consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335; *see also* Compl. ¶ 93.

D.   Analysis

The crux of plaintiffs' procedural due process claim is that, "[h]aving created an absentee voter regime through which qualified voters can exercise their fundamental right to vote, the State must now provide absentee voters with constitutionally adequate due process protection" before refusing to count an absentee ballot with a signature issue. Compl. ¶ 92. As explained below, plaintiffs have not met their burden of showing serious questions or a likelihood of success on the merits of this claim, because they have not shown they satisfy by clear and convincing evidence the second factor articulated in *Mathews*, namely the "risk of an erroneous

deprivation" of their interest in having their votes counted. Specifically here, plaintiffs have not shown the Registrar provided constitutionally inadequate procedures to cure their ballot signatures. *See Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008) (rejecting plaintiffs' procedural due process claim based on county's rejection of unverifiable referendum signatures without allowing an opportunity to cure signatures, finding "the state's important interests justify the minimal burden on plaintiffs' right[]" to vote).

First, the court notes that plaintiffs' allegations and arguments appear to raise some fair questions regarding the clarity and adequacy of the notice provided to voters whose vote-by-mail ballots raised signature issues that required curing. The letter the Registrar sent to these voters to notify them of the need to cure instructs them to deliver a signature verification statement in person to the Registrar's office, or by mail, fax or email "no later than . . . two days prior to the certification of the election," without providing a date of certification for reference anywhere on the letter. *See* Unsigned Ballot Envelope Letter at 1–4. This wording effectively meant that, without additional investigation from the voter, no due date was obvious by which he or she needed to send in the necessary information to cure a challenged ballot. Voters could not necessarily visit the Registrar's physical office, as it was closed to the public starting either March 23 or April 1, 2020, due to the County's shelter-in-place order during the coronavirus pandemic. *See* Fugazi Decl. ¶ 1 (March 23, 2020); Suppl. Dubroff Decl. ¶ 10 (April 1, 2020). Perhaps most troubling, if a voter were to have visited the Registrar's website for clarification, that voter would have found only a notice from a prior election, displaying the past date of November 25, 2018, as the deadline by which voters could submit their cure forms. Compl. ¶ 20. During an election cycle disrupted by pandemic, potentially heightening the importance of being able to vote by mail where that option is available under state law, the lack of attention to the kind of meaningful detail voters might be looking for could raise a red flag if supported by meaningful evidentiary detail.

At the same time, however, on this record the court cannot find a likelihood that the failure to provide a clear due date in writing or on the website deprived plaintiff voters of procedural due process, as the Registrar here has submitted evidence showing voters were able to

phone the Registrar's office at the number provided on the cure notice during all times when the office doors were closed to the public. Dubroff Suppl. Decl. ¶ 10 (Registrar's staff assigned to answer telephone calls, emails and faxes after April 1, 2020); *id.*, Ex. B, ECF No. 24-2 (Registrar's notice explaining "essential services" available by phone during San Joaquin County's pandemic-related shutdown). Plaintiffs provide no evidence to suggest voters tried to call the Registrar's office and got no answer, or that voters called the office and received incorrect information about the date by which they needed to return the necessary documents to cure their ballots' signature issues. Moreover, plaintiffs have not submitted any evidence showing any of the named plaintiffs were unable to cure their ballots by two days prior to certification as a result of the lack of clarity in the notice, and if so why. Plaintiffs have not shown "the risk of an erroneous deprivation of [plaintiffs'] interest through the procedures used," *Mathews*, 424 U.S. at 335, was high enough to warrant additional safeguards here. *Cf. Lemons*, 538 F.3d at 1104.

Second, plaintiffs present evidence that at least one voter may not have received any notice at all that his ballot required curing, at least not until the recount was underway. Lopez Decl. ¶ 5 ("I did not receive notice by mail that there was a deficiency in my signature."). The Registrar says her office did mail notices to every voter whose ballot was challenged, providing her own declaration generally verifying that notices were mailed, and pointing to a log of the 1,585 voters sent the notices. Suppl. Dubroff Decl. ¶ 13; Voter Log at 46. The Registrar takes the position that the evidence she has provided raises the presumption that Mr. Lopez received the mailing, and that it is fair to assume he received it three days after her mailing. Surreply at 7. But the Registrar's evidence does not satisfy the requirements for the presumption to kick in here. *See, e.g.*, *Lynch v. N. Am. Co. for Life & Health Ins.*, 300 F. Supp. 3d 1158, 1165 (D. Idaho 2018) (finding testimony of organizational officer in charge of mailroom competent evidence for mailroom's customary practice, but inadmissible to show specific piece of mail was sent for lack of personal knowledge). The court thus considers Mr. Lopez's declaration as evidence of his nonreceipt of the notice, absent the presumption of receipt.

The Registrar also says she arranged for staff in her office to make phone calls to voters who were sent cure notices and did not return them, going beyond what state law requires

of her. Dubroff Decl. ¶ 11. Mr. Lopez says he also did not receive a call from anyone about an opportunity to cure his ballot. Lopez Decl. ¶ 7. A Registrar's Office staff member who made these phone calls has provided a declaration saying she made calls between March 16 and March 27, describing the statements she made on the calls, and noting that she "carefully maintained" a handwritten record of her calls on her own copy of the log. Magathen Decl. ¶ 4, ECF No. 25. Her copy of the report with her notes, however, "was not retained." *Id*. As noted above, plaintiffs submit evidence suggesting the Registrar admitted in a discussion with Ms. Fugazi that "it was now too late to send out mail curing notices and affidavits to voters, so staff made calls," Fugazi Decl. ¶ 1; *see also* Reply, Ex. 8 (Sawyer Decl.) ¶ 6; Reiman-Estes Decl., ¶¶ 4–8; Estes Decl., ¶¶ 4–5. The Registrar's staff member who made the calls does not say she called only the subset of voters who were mailed notices and had not returned those notices by the date of her call; rather she says she placed calls to "the subset of voters that had returned vote-by-mail ballots [] that had deficiencies related to the identification envelopes, such as no signature or a mismatched signature, that resulted in their [] ballots being disqualified." Magathen Decl. ¶¶ 2–3. Given that the Registrar's staff member made calls starting on March 16, before the Registrar says the last notices were mailed on March 18, Dubroff Decl. ¶ 10, there may be something to plaintiffs' suggestion that the Registrar said she was running out of time, although the Registrar says she does not recall saying what plaintiff Fugazi heard. Dubroff Suppl. Decl. ¶ 13. The court need not resolve any credibility contest raised by the declarations on this point at this stage, however. Even if due process required phone calls under the circumstances, a proposition for which plaintiff offers no supporting authority, plaintiffs provide only the single, unadorned Lopez declaration saying he received neither a mailed notice nor a call. This lone declaration is not sufficient to raise a serious question and, in the context of the current record, suggests only a "garden variety" state election irregularity, the type of "mistake" that typically does not rise to the level of a constitutional violation, as opposed to the kind of systemic flaw plaintiffs believe is exposed by the Registrar's practices, constituting "a pervasive error that undermines the integrity of the vote," *Bennett*, 140 F.3d 1226–27. Even if plaintiffs might ultimately be able to

demonstrate more widespread problems of a constitutional nature, they have not done so at this time.

In sum, plaintiffs have not met their burden of showing by clear and convincing evidence they are likely to succeed on their claim that Registrar Dubroff violated their procedural due process rights by failing to provide voters with adequate notice prior to certifying the election results.  The first and most important prong of the *Winter* test is not satisfied, and the court need not reach the other prongs.

IV.     CONCLUSION

Plaintiffs' motion for a temporary restraining order, ECF No. 4, is DENIED without prejudice to the filing of a motion for a preliminary injunction and seeking in connection with any such motion expedited discovery.

IT IS SO ORDERED.

DATED: May 22, 2020.

_____
CHIEF UNITED STATES DISTRICT JUDGE