ALLEN SAWYER CA State Bar No.:  173565
**ROSENFELD & SAWYER**
1107 9th Street, Suite 850
Sacramento, CA 95814
Telephone: 916-447-2070
Facsimile:  916-447-2097
Email: allen@allensawyer.com

CHARLES L. HASTINGS - CA State Bar No.: 88599
NATALI A. RON - CA State Bar No.: 302927
LAW OFFICE OF HASTINGS & RON
4568 Feather River Dr., Ste. A
Stockton, CA 95219
(209) 476-1010
Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORIA

| | |
|---|---|
| CHRISTINA FUGAZI;<br>ALEX GONZALEZ;<br>ANNETTE ZIMMER;<br>FRANCISCO MACIAS;<br>JAMAR C. BERRY;<br>JO A. LAING;<br>BENJAMIN R. HERRERA;<br>DIVINE JANE LEANOS;<br>ELIZABETH LAWRENCE WHITE;<br>MARC LAWRENCE WHITE;<br>KALANI MARSHALL BLACK;<br>TARKDEEP SINGH;<br>TOOBA NAVEED;<br>VALDOMERO LOPEZ;<br>                              Plaintiffs<br>v.<br><br>ALEX PADILLA, in his official capacity as Secretary of State for the State of California; MELINDA DUBROFF, in her official capacity as the San Joaquin County Registrar of Voters, and DOES 1 through 50. | CASE NO. 2:20-CV-00970-KJM-AC<br><br>FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF.<br><br>(Section 2 of the Voting Rights Act of 1965 (52 U.S.C. § 10301); Section 8 of the National Voter Registration Act of 1993 (52 U.S.C. § 20507); Voting Provisions of the Americans with Disabilities Act (codified at 42 U.S.C. § 12101 et seq.); First and Fourteenth Amendments to the United States Constitution; 42 U.S. Code § 1983) |

1

The named Plaintiffs, on behalf of themselves and all other similarly situated voters, allege as follows:

**JURISDICTION AND VENUE**:

1. This Court has jurisdiction to grant both declaratory and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202.

2. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 12133 because this action arises under the United States Constitution and federal statutory law. It seeks relief for the Plaintiffs based on deprivations of constitutional and federally guaranteed statutory rights. Defendants have taken action, and refused to act, under color of state law. Jurisdiction further vests pursuant to 42 U.S.C. §§ 1983 and 1988.

3. This Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. section 1367(a), as all state law claims for relief arise from the same nucleus of facts and form part of the same case or controversy under Article III of the United States Constitution. State claims for relief include claims under California Code of Civil Procedure section 1085 (writ of mandate) and violations of the California Elections Code.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this district.

**INTRODUCTION:**

5. This is a putative class action pursuant to Fed. R. Civ. P. 23 seeking (a) injunctive and declaratory relief arising from Defendants' denial of Plaintiffs' rights to vote in the March 3, 2020 California Presidential Primary and Spring Election (the "Spring Election"); and (b)

2

prospective injunctive and declaratory relief requiring Defendants to establish reasonable, accessible, and constitutionally sufficient voting procedures (including voting by mail) for California's November 3, 2020 General and Presidential Election (the "Future 2020 Elections").

6. This action is seeking remedial and prospective injunctive relief related to the March 3, 2020 California Presidential Primary and recount in San Joaquin County.

7.  Despite a worldwide pandemic involving a novel coronavirus known as COVID-19 that to date has infected more than 10 million people and killed approximately 500,000 individuals worldwide, MELINDA DUBROFF, in her official capacity of the San Joaquin County Registrar of Voters, chose politics over the interests of San Joaquin County citizen voters in an intentional and self-serving certification an election that disenfranchised numerous voters in the Presidential Primary Election. This action is directed at the now-established harm that came about as a result of the Defendants' action and inaction.

8. California Elections Code Section 3019, 15100 through 15112, and 15150 through 15452, et sequitur, expressly set forth the duties of a County elections official (i.e., the Registrar) with respect to the canvassing of votes and certification of election results.

9. Plaintiffs seek relief for violations of San Joaquin County citizens' right to vote, protected by the First Amendment to the U.S. Constitution and by their Fourteenth Amendment right to equal protection of the laws, pursuant to 42 U.S.C. § 1983; their rights under Section 2 of the Voting Rights Act (codified at 52 U.S.C. § 10101 *et seq.*); and in accordance with the voting provisions of the Americans with Disabilities Act (codified at 42 U.S.C. § 12101 *et seq.*). Plaintiffs tell a story about how the Defendants' insistence on arbitrarily certifying an election during the pandemic left vulnerable voters disenfranchised and unable to exercise their fundamental right to vote without impairment of that choice. This lawsuit demonstrates that there is no compelling

justification, let alone rational basis, for ALEX PADILLA, in his official capacity as Secretary of State for the State of California; MELINDA DUBROFF, in her official capacity of the San Joaquin County Registrar of Voters not to follow the Governor of California's Executive Order allowing for an extension of all canvassing and certification deadline periods while disruptions are present related to the pandemic.

**STATEMENT OF FACTS:** [1]

10.  Plaintiffs are Christina Fugazi, a candidate to represent California Assembly District 13 in the Primary Election held on March 3, 2020, and thirteen persons registered to vote in San Joaquin County who seek to represent a class of similarly situated voters. These voters voted by mail and their mailed-in ballots were rejected primarily for lack of signatures on the return envelopes or for non-matching signatures.

11.  On March 4, 2020, the day after the election, the Governor of California proclaimed a State of Emergency in the state due to the COVID-19 pandemic.  Slightly more than two weeks later, on March 20, 2020, the Governor specifically addressed the effect of COVID-19 on the counting of votes cast in the March 3rd elelction by issuing Executive Order N-34-20.  This Executive Order extended all deadlines "associated with completing, auditing, and reporting on the official canvass" by 21 days, to provide relief to County elections officials who were in the middle of the official canvass. This Order urged county elections officials "to complete activities related to the official canvass according to the deadlines ordinarily imposed by state law, to the extent possible."  At the same time, however, the Governor directed that "[e]lections officials shall provide maximum possible notice to voters about how to participate in each of these elections,

---

1        In support of this Statement of Facts, Plaintiffs hereby incorporate all the declarations, exhibits and ECFs previously filed with the Court herein as if here fully set forth.

paying particular attention to the needs of voters at high risk from COVID-19, individuals with disabilities, and other voters with particularized needs." (Executive Order N-34-20. ¶ 3 at 8–9.)

12.  Following the Governor's issuance of the March 20 Executive Order, on March 23, 2020, the California Secretary of State issued Memorandum No. 20068, directed to county elections officials regarding compliance with the order, identifying which calendar entries in the Secretary of State's March 3, 2020, Primary Election calendar were extended by the executive order. (Sec'y of State's Mem. No. 20068).

13.  The San Joaquin County Registrar's Office, is located at 44 N. San Joaquin Street, Ste. 350 (a County Administration Building), in Stockton, California.  That Office was closed to the public during the canvassing process in light of the statewide state of emergency. The Registrar claims a drop-box was set up to receive cure affidavits at the entrances to the building in which her office is located. However, the Registrar had placed a permanent, bold, sticker on said drop-box that advised the public not to use the box after election day.

14.  The Registrar told Plaintiff Fugazi that the office was closed starting March 23, 2020. However, it is alleged a Public Notice was put out stating, "Effective April, 2020, the County Administration Building is closed to the public until further notice"

15.  Prior to the Governor's Order extending the dates by which to complete voter canvasses, the San Joaquin County Registrar of Voters, Melinda Dubroff ("the Registrar"), would have been required to certify her county's election results by April 2, 2020, the normal 30-day deadline in effect on the primary election date.  After the Governor's Order took effect, the Registrar certified the election on April 5, 2020.

16.  The Registrar arbitrarily accepted twelve (12) voters cure affidavits in the first certification of the Presidential Primary Election and counted those twelve (12) votes even though the cure

affidavits were received by the Registrar after the said deadline (within two (2) days of the April 5, 2020 certification). One (1) said vote was cured on April 4th and eleven (11) were cured on April 5th.

17. The Registrar claims that notices were sent to voters who needed to cure their mail-in votes between February 15, 2020, and March 18, 2020.  The Registrar's office claims that 1,585 voters were provided with notice of the opportunity to cure defects in their signatures in accordance with California Elections Code section 3019(d)(1).  The notices told voters "[t]he signature verification statement must be received by the elections official of the county where you are registered to vote no later than 5 p.m. two days prior to certification of the election."

18.  The notices did not inform voters as to the date when the election would be, or could be, certified.

19.  The Registrar claims she arranged for staff in her office to make phone calls to voters who were sent cure notices and did not return them. This was apparently done because, in her haste to certify the election results, in contravention of the Governor's order to "provide maximum possible notice to voters about how to participate" she was unable to provide notices by mail in time for her intended early certification of the results.

20.  A staff member of the Registrar who allegedly made those phone calls provided a declaration saying she made calls between March 16 and March 27, describing the statements she made on the calls, and noting that she "carefully maintained" a handwritten record of her calls on her own copy of the log.  However, her copy of the report with her notes "was not retained."

21.  Retention of such records for a minimum of six months is mandated by California Elections Code section 17304. The destruction of records pertaining to the phone calls occurred during the

recount. The Registrar's staff member who made the calls does not say she called only the subset of voters who were mailed notices and had not returned those notices by the date of her call; rather she says she placed calls to "the subset of voters that had returned vote-by-mail ballots that had deficiencies related to the identification envelopes, such as no signature or a mismatched signature, that resulted in their ballots being disqualified."

22.  Alexandria Lopez was an observer for a school board race in the Presidential Primary Election recount. He made the following observations during the recount:

> "[o]n multiple occasions I personally witnessed notes on ballots that demonstrated an employee contacted a voter via telephone. One note was clearly written on March 11 and it said the voter would be coming in to correct. A question was asked multiple times in regard to said calls as to who directed the calls, if there was a record to distinguish what voters received calls and why and what was actually said. Registrar Dubroff stated employees should have notified voters they could correct via email but said she couldn't be certain they were all informed of this. And, she refused to respond to the remaining questions."

23.  The Registrar certified the election results on Sunday, April 5, 2020.

24.  The Registrar did not provide Plaintiff voters a minimum eight days' notice prior to this certification date, to allow them to cure mismatched signatures or the absence of signatures on ballot envelopes, as required by the California Elections Code. *see* Cal. Elec. Code § 3019(d)(1). Eight days prior to April 5 was Thursday March 26, 2020.

25.  On April 14, 2020, Ms. Fugazi requested a recount of the ballots cast for candidates for Assembly District 13. During the course of the recount, on April 21, 2020, approximately, thirty-five vote-by-mail voters submitted5 their signature verifications to the Registrar. The Registrar

declined to count the votes of those persons who submitted cure documents, on grounds their verification statements were untimely.

26. Another group, or subset of eleven (11) other mail-in voters signed their affidavits to cure their vote between March 16, and April 9 and sent them in to the Registrar.  The Registrar's records indicate those eleven (11) affidavits were <u>all received </u>on April 13, after the Registrar certified the election results. The Registrar refused to count any of those ballots.  Though they were apparently sent in on various dates over a three-week period, they were all either received on the same day or processed on the same day.  This indicates there actually were problems and delays in mail delivery due to the pandemic or delays in the Registrar's processing of the cure affidavits. This is a different subset of cure voters than the previously identified thirty-six (36) plaintiff voters. This brings the total disenfranchised voters who attempted to cure their vote to forty-seven (47);

27.  Thirty-six (36) plaintiff voters signed affidavits to cure their votes that were cast on or before the March 3 election day and those affidavits were personally delivered to the Registrar's Office by 5:00 pm on April 21, 2020.

28.  Of those thirty six (36) plaintiff voters, twenty (20) have provided declarations relating to their efforts to cure their votes.  Nine (9) of the declarations from those voters acknowledged receiving a notice to cure their vote from the Registrar and four (4) of those nine voters immediately (within two days) filled out an affidavit to cure their vote and mailed said affidavit to the Registrar's Office. However, the Registrar has no record of receiving said affidavits to cure said votes. Those four (4) voters received their cure letters between March 6 and March 16. Thus, if mail delivery had been operating normally, the Registrar should have received those affidavits more than two days before the election was certified.

8

29.  Not one of the declarants who allegedly were sent cure notices by the Registrar Office (but according to the Registrar did not timely cure their vote) received a "heads up" phone call from the Registrar's Office.

30.  During the recount, it was discovered that 70 Provisional Ballot Envelopes for ballots that were empty and were tabulated in the regular count, even though the eligibility of the voter was not verified. During the recount, it was further discovered that 14 Conditional Voter Registration Envelopes for ballots were empty and were tabulated in the regular count, even though the eligibility of the voter was not verified.

31.  During the recount, on April 23, 2020, Ms. Fugazi spoke with the Registrar. The Registrar told her that her "staff [had] identified issues with signature sheets for vote by mail ballots" but "it was now too late to send out mail curing notices and affidavits to voters, so staff made calls." The Registrar was "not sure" if logs were kept of staff calls to voters in an attempt to cure vote by mail signature issues.

32.  Two other witnesses recount a conversation in which the Registrar said, in substance, "there was not enough time to write all voters that needed to cure deficiency in vote by mail signatures and in some instances . . . the Registrar's staff phoned said voters instead."

33.  The plaintiff voters were contacted by the Christina Fugazi campaign during the recount and were then informing that their ballots were on a list of flagged voters whose votes were categorized as failure to cure by the Registrar's Office. It was only then that they learned their ballots had not been cured by their previous cure efforts. This could be an indication of a disruption of mail service during the COVID-19 pandemic or a disruption in mail processes at the Registrar's Office. These voters for a second time filled out affidavits to cure their votes which were the ones then personally delivered to the Registrar's Office before 5:00 pm April 21,

2020. This time the Registrar acknowledged these voters second cure attempts but refused to count said votes because the cure was considered late.

34.  On May 15, 2020, while the recount continued, the Registrar discovered that 21 voted ballots had been placed in boxes for unused ballots after the polls had closed on election day. On May 18, 2020, six weeks after certification, the Registrar decided to accept and tabulate those 21 newly discovered ballots.


35.  Upon receiving Vote-by-Mail ballots, the Registrar is required to confirm the identification envelope is signed, and to compare the voters' signature on the identification envelope containing the ballot with information in the voters' registration records to determine whether the signature compares. If the Registrar determines the signature does not compare, or if the envelope is not signed, the Registrar is required to provide notice to all identified voters a minimum of eight days before the certification of the election to afford such voters the opportunity to verify their signatures or sign their envelopes.

36.  Even under normal circumstances, if the Registrar determines the signature does not compare to the voter registration records, the Registrar cannot reject a vote if a voter delivers in person, or by mail, fax, or email, a signed verification statement verifying their ballot submission, by 5 p.m. two days prior to the certification of the election.

37.  If a voter neglects to sign their identification envelope, the Registrar cannot reject the unsigned Vote-by-Mail ballot if the voter signs the envelope at the Registrar's office by 5 p.m., two days prior to the certification of the election. Alternatively, a voter can submit an "unsigned ballot statement" on election day before the polls close.

38. Certification generally occurs no later than 30 days following the election, meaning, in this

case by April 2, 2020.  However, the Governor declared a state of emergency as a result of the threat of COVID-19, and issued an executive order March 20, 2020, extending all deadlines associated with "completing, auditing, and reporting on the official canvass" by 21 days. The Governor further requested the Secretary of State to issue guidance to the Registrars in California Counties concerning compliance with the Governor's order. The Secretary of State did issue its memorandum regarding such compliance. On March 23, 2020, the Secretary of State's memorandum confirmed the extension dates for all canvass-related deadlines. Specifically, the Secretary of State extended the Registrar's date to send notices to voters to cure their signatures from March 25, 2020, to April 15, 2020, and extended the voters deadline to cure mismatched signatures or unsigned identification envelopes from March 31, 2020, to April 21, 2020. Therefore, prior to the voter's deadline to cure their votes, the Registrar had the authority to accept the voter's verifications or their attempts to cure any irregularities with their identification envelopes and to ensure their votes were tabulated.

39. The timeline for voters to cure their unsigned or non-compared signature was therefore extended by executive order, and the Secretary of State's memorandum, to April 21, 2020, because of the COVID 19 pandemic impacts on the election process.

40. The Registrar failed to notify voters to cure their unsigned or non-compared signatures before certification as required by statute.

41. An attorney with the Secretary of State's office recently signed a declaration saying that the extension of time granted to certify the Presidential Primary Election is permissive at the Registrar's sole discretion, notwithstanding the previous memorandum's language that claimed the deadline dates for cure votes had been extended to April 21, 2020, as well as language requiring election officials to notify the voters of such deadlines.

42. Notwithstanding the Secretary of State's declaration deadlines, the Registrar certified the election on April 5, 2020. Instead of notifying voters of the dates to cure their signatures set by the Secretary of State, the Registrar hastily mailed notices to some voters, and contacted others by phone, in her rushed attempt to prematurely certify the election on the arbitrary date of Sunday, April 5, 2020 at 5:30 pm. The false urgency resulted in an egregious violation of many voter's Constitutional rights by frustrating their ability to have their ballot counted properly and included in the totals of votes cast with respect to candidates for public office and ballot measures.

43. In addition, the Registrar was aware that she had failed to adequately notify voters to cure their unsigned or non-compared signatures and instead of correcting the situation chose to arbitrarily certify the election on a Sunday night when she had additional time granted by Secretary of State as per the Governor's Executive Order extending the time to certify the election by 21 days. The Registrar had additional time granted by the Governor to avoid disenfranchising voters to count every valid vote, but she failed to notify voters of the additional time and rushed the certification.

44.  Because of growing concerns and statements issued by the Governor and Centers for Disease Control and Prevention, many individuals were fearful of handling received mail for concerns of the possible transmission of the COVID-19 virus via handling documents. Many individuals therefore did not receive actual notice from the Registrar of their rights prior to the Registrar's April 5, 2020, certification in time to cure by signing a verification or submitting a signature to ensure their vote was not invalidated. Moreover, many voters were unable or afraid to leave their houses to go to mailboxes, the post office or the Registrar's Office to return their verification statements.  By the Registrars own admissions, she failed to send some voters

12

written notification because she was past the time to legally send cure notices.

45. Further frustrating legislative intent and voter's constitutional rights, due to the COVID-19 pandemic, the County Building where the Registrar's office is located on the third floor was closed to the public during the cure period, and people were subject to a State-wide Shelter-in-Place Order making travel illegal. The Governors order extending time recognized that voters were unable or afraid to leave their houses to go to their mailboxes, the post office or the Registrar's Office to return their verification statements. Accordingly, those individuals receiving notice that their identification envelope was unsigned could not sign the envelope at the Registrar's office, as required by law. Very likely voters were delayed in receiving said notices from the Registrar due to documented disruptions in the United States Postal Service. All voters whose ballots were rejected by the Registrar were precluded from delivering their verifications in person, disproportionately impacting those individuals who lack access or the ability to utilize electronic means of submission by either facsimile or electronic mail, such as the impoverished and elderly communities.

46. Again, some individuals received a mere phone call ostensibly advising that their votes would not be considered. The Registrar did not document these calls. The Registrar cannot tell anyone what the voter was told in said phone call. There was no standard script for staff in how they guided and explained to said voters the available verification process to cure and protect their vote, and guarantee that said vote will be counted. This process can only be described as arbitrary and capricious. Most disconcerting is a voter was not given enough time to verify their vote as required by election code. Information obtainable from the Registrar's website incorrectly advised voters that they could submit their verification forms by November 25, 2018, (sic) adding to the confusion of the voting process for anyone who did not receive

13

notification via mail, or anyone who also accessed the conflicting online notification.

47. Plaintiff is informed and believes, and on this basis alleges that at least 36 and

maybe as many as 50 Vote-by-Mail voters submitted their signature verifications to the Registrar

during the recount and before the Secretary of State's April 21, 2020 deadline; however, the

Registrar refused to process and tabulate those ballots in the recount.

48. Plaintiff was a candidate for Assembly in the California Assembly District 13. As

can be seen in the Registrar's certified statement of results of the election, Plaintiff received

31.24% of the certified vote, placing third. Kathy Miller placed second with 31.27% of the

certified vote. Plaintiff is informed and believes that thirty votes separated Kathy Miller and

Plaintiff.  First place and second place finishers in Presidential Primary Race for Assembly in the

California Assembly District 13 advance to the Presidential General Election. During the recount

the separation has become closer and as of April 26, 2020, Plaintiff is informed and believes,

only 22 votes separate Kathy Miller and Plaintiff.

49. Plaintiff's: Alex Gonzalez, Latino male; Annette Zimmer, female; Francisco

Macias, Latino male; Jamar C. Berry, African American male; Jo A Laing, senior citizen

female who had a stroke recently and cannot sign exactly the same as when she originally

registered to vote many years ago; Benjamin R Herrera, Latino senior citizen male with

Dementia; Divine Jane Leanos, Filipino female; Elizabeth Lawrence, senior citizen Disabled

female; Marc Lawrence, senior citizen male; Kalani Marshall, African American male;

Tarakdeep Singh, East Indian, male college student; Tooba Naveed East Indian East Indian,

male college student; Valdomero Lopez, Latino male voted in the California Assembly

District 13 race and were duly registered in San Joaquin County and whom timely voted by mail

in the March 3, 2020, Presidential Primary Election and have signed and submitted affidavits and

turned said affidavits into the San Joaquin County Registrar's Office verifying their signatures

for the vote they cast and they have not been counted by the Registrar. These plaintiffs were

voters in California Assembly District 13 of San Joaquin County for the March 3, 2020

Presidential Primary Election and turned in their affadavits to the Registrar before 5:00 pm on

April 21st, 2020, the extended deadline for said cure granted by the Governor's Emergency

Executive Order.

50. Plaintiff is informed and believes, and on this basis alleges that of those known 36

Vote-by-Mail voters that submitted their signature verifications to the Registrar during the

recount and before the Secretary of State's April 21, 2020 deadline at least twenty (20) of them

are women which represents fifty-five percent (55%), twenty two (22) are from a minority

groups which represents sixty one percent (61%). Of the minority groups, seven (7) voters are

Latino, five (5) voters are East Asian Hmong/Vietnamese, six (6) voters are Central Asian

Indian/Punjabi, and four (4) voters are African American.

51. Notification letters, from the San Joaquin County Registrar—which is a covered

jurisdiction for Spanish language access under Section 203 of the Voting Rights Act—are

provided only in English. Applicants who are limited English proficient have more difficulty

understanding the notification letter. They also face additional challenges when communicating

with election officials and completing other tasks required to remedy the problem with their

signature status.

52. In addition, minority voters are more likely than White voters to work multiple

jobs, have inflexible schedules, maintain irregular work hours, lack access to transportation, or

suffer from financial hardship or economic displacement. It is more difficult for these voters to

follow up with election officials in a timely manner than those who have access to transportation,

can afford to take time off from work, and have a flexible schedule.

53. Plaintiff is aware of fourteen (14) other Vote-by-Mail voters that submitted their signature verifications to the Registrar during the recount and before the Secretary of State's April 21, 2020 deadline but is unaware of their minority status. Plaintiff believes this has disenfranchised at least 45-60 Vote-by-Mail voters that submitted their signature verifications to the Registrar during the recount and before the Secretary of State's April 21, 2020.

54. Plaintiff lawfully requested the Registrar to count Vote-by-Mail voters that submitted their signature verifications to the Registrar during the recount and before the Secretary of State's April 21, 2020 deadline for the office of California State Assembly District 13.

55. However, the Registrar continues to refuse to process any of the ballots of voters who submitted verifications in accordance with the Secretary of State deadlines, claiming they were not timely submitted. The Registrar admitted that she ran out of time and could not mail cure notices to the very same voters, giving them an opportunity to verify their vote. The Registrar had the lawful authority to certify the election later if she chose to take the additional time granted by Secretary of State as per the Governor's Executive Order extending the time to certify the election by 21 days.

56. Plaintiff Fugazi has identified at least thirty-six (36) voters in the California Assembly District 13 of San Joaquin County who timely voted by mail in the March 3, 2020, election that have signed affidavits and turned said affidavits into the San Joaquin County Registrar's Office verifying their signatures for the vote they cast and they have not been counted by the Registrar.

57. These thirty-six (36) voters in California Assembly District 13 of San Joaquin County for the March 3, 2020 Presidential Primary Election turned in their votes to the Registrar before 5:00 pm on April 21st, 2020, the extended deadline for said cure granted by the Governor's

16

Emergency Executive Order.

58. The Registrar neglected her duty to give adequate notice to the voters but they would have

clearly understood from the Secretary of State's memorandum, and the March 3, 2020,

Presidential Election Calendar, that they had until April 21, 2020, to cure any matters with their

signatures on the identification envelopes.

59. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1343(a) because

it seeks to redress the deprivation, under color of state law, of rights, privileges and immunities

secured by the Voting Rights Act and 28 U.S.C. § 1331, because it arises under the laws of the

United States.


**CLASS ALLEGATIONS**

60. Plaintiff proposes a Class distinguished by the remedial and prospective relief

sought in this Complaint.

61. The Class consists of thirty-six (36) voters registered to vote in the San Joaquin

County in the State of California as of March 3, 2020, who due to either disabilities, language

barriers, or genuine fear of contracting the novel coronavirus, did not vote in person on March 3,

2020. All Class members submitted a timely vote-by-mail ballots in accordance with the rights

afforded to them by the State of California. Despite the Class members lawful and timely

submission of ballots, the County Registrar of Voters' disenfranchised the Class when she

refused and failed to certify the Class' votes.

62. This case may be appropriately maintained as a class action under Rule 23 of the

Federal Rules of Civil Procedure because all of the prerequisites set forth under Rule 23(a) and

23(b) are met.

Rule 23(a) Factors

63. Numerosity. Members of the Class are so numerous that joinder of all such members is impracticable, if not impossible. Although the Complaint identifies thirty-six (36) members of the Class, there is reason to believe that more, possibly upwards of sixty (60) San Joaquin County voters in District 13 have been disenfranchised as a result of the actions taken by the County Registrar of Voters.

64. Existence of Common Questions of Fact and Law. There are questions of law and fact common to the Class with respect to the remedial and prospective relief. Specifically, such common issues include, but are not limited to:

65. All members are residents of San Joaquin County in the State of California.

66. All members were registered to vote by March 3, 2020 and opted to lawfully vote by mail.

67. All members were precluded from entering the County Registrar of Voters' office within the respective timeframe from when they were notified (either officially or unofficially, if at all) to final deadline to verify their votes due to the restricted access to the office building.

68. All members were affected by the unprecedented voting regulations.

69. All members were affected by the variety and ambiguity of instruction received from Defendant and were therefore unequally treated in pursuit of submitting their vote.

70. The damages caused by Defendant in relation to her misconduct during the Primary Presidential Election stem from the same uniform misconduct and deprivation of the Class members' rights.

71. Typicality. The Class members' claims have a common origin and share common bases with the Plaintiff which originate from the same unconstitutionally invalid practice of the

Defendant. If brought and prosecuted individually, the claims of all the class members would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

72. Adequacy. The Plaintiff named in this complaint will fairly and adequately protect the interests of the Class because she and her counsel possess the requisite resources and experience to prosecute this case as a class action. Plaintiff's interests do not conflict with the interests of the Class members she seeks to represent.

Rule 23(b) Factors

73. Fed. R. Civ. P. 23(b)(1). The prosecution of separation actions by the Class members would create a risk of inconsistent or varying adjudications with respect to individuals that would establish incompatible standards of conduct for parties opposing the class under Fed. R. Civ. P. (23(b)(1)(A). In addition, the prosecution of separate actions would create a risk of adjudication with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, and subsequently impair, or impede their ability to protect their interests under Fed. R. Civ. P. (23)(b)(1)(B).

74. Fed. R. Civ. P. 23(b)(2). Defendant has acted, refused to act, or likely will continue to act on grounds that apply generally to all class members by refusing to respect the constitutional rights of the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

75. Per Fed. R. Civ. P. 23(b)(3). There are common questions of law or fact common to all members of the Class that predominate over any questions affecting only individual members of the Class. A class action is superior to other available methods for fairly and efficiently

adjudicating this controversy as provided for in Fed. R. Civ. P. 23(b)(3)(A) to (D).

76. Plaintiff knows of no difficulty that will be encountered in the management of this

litigation that would preclude its maintenance as a class action. The names and addresses of the

members of the Class are available from the State of California which maintains a list of all

registered voters and those who voted in the March 3, 2020 election. The County Registrar of

Voters' office will also have a list of people whose votes remain to be certified pursuant to this

Complaint.

**GROUNDS FOR RELIEF REQUESTED**

77. Defendant had and continues to have a ministerial duty, as set forth in Elections

Code.

78. Defendant had and continues to have a ministerial duty, to count all legally cast

votes in the Presidential Primary Election.

79. Defendant was obligated to perform her ministerial duties no later than April 21,

2020. Defendant is now in violation of the statutorily defined timeframe to perform the

ministerial acts required. By failing to perform their ministerial duties within the prescribed

timeframe, Defendants breached their obligations under the Election Code and Executive Order

of the Governor.

80. As a result of Defendant's failure to perform her ministerial duties set forth in

Elections Code, Plaintiffs are suffering irreparable harm since they have not had lawful votes

counted that could realistically advance Plaintiff to the General Presidential Election.

81. As a result of the Defendants' failure to perform their ministerial duties set forth

in Elections Code, both the taxpayers and the voters of San Joaquin County will suffer severe

consequences since the will of those voters who cast their votes at the March 3, 2020 Presidential

20

Primary Election has been ignored, and effective government in San Joaquin County is being compromised due to the creation of an ongoing and unnecessary delay in declaring what two Assembly 13 candidates advance to the Presidential General Election.

82. 28 U.S.C. §§ 2201 and 2202 authorizes the use of an injunction, as follows:

83. An injunction may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station, or to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled and from which the party is unlawfully precluded by such inferior tribunal, corporation, board, or person.

**FIRST CLAIM FOR RELIEF**

**Declaratory and Injunctive Relief Violations of Amendments I and XIV of The U.S. Constitution 42 U.S.C. § 1983**

**Total Deprivation of Voting Rights**

84. Plaintiff hereby realleges and incorporates each and every allegation contained in each of the foregoing paragraphs of the complaint as though fully set forth herein.

85. The First Amendment guarantees the rights of citizens to participate in the political process, including the right to vote.

86. The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

87. Both the Fourteenth Amendment of the United States Constitution and Article I, Section 7, of the California Constitution prohibit denial to person of the equal protection of the laws. These constitutional provisions require that persons who are similarly situated receive like treatment under the law and that statutes may single out a class for distinction only if that classification is

21

not based on a protected classification or quasi-protected classification and bears a rational

relationship to a legitimate purpose of the statute.

88. The United States Supreme Court ruled in *Reynolds v. Sims* that because "the right to

exercise the franchise in a free and unimpaired manner is preservative of other basic civil

and political rights, any alleged infringement of the right of citizens to vote must be carefully and

meticulously scrutinized."

89. States are not obligated by the U.S. Constitution to allow vote-by-mail. However, once they

decide to make vote-by-mail voting available, under ordinary circumstances, a state that denies

absentee ballots to some voters while allowing other voters in similar or identical circumstances

to use absentee ballots, without affording a comparable alternative means to vote, is engaging in

arbitrary, invidious discrimination that violates the Equal Protection Clause. When the State's

arbitrary discrimination rests on its stubborn refusal to acknowledge how the most serious public

health crisis in the United States for more than a century would certainly destroy many voters'

ability to cure their vote-by-mail as protected by statute, the State's violation of its citizens' most

fundamental right is outrageous.

90. The California Governor's Executive Order, established the defendant's right to

postpone the certification of the Presidential Primary Election, meaning that right and authority

in California existed solely and exclusively with the defendants which chose not to take action

despite the pandemic. Such inaction is the equivalent of action under the law.

91. Defendant may not irrationally single out one class of individuals for discriminatory

treatment. The Equal Protection Clause denies Defendant the power to act different treatment be

accorded to persons placed by a statute into different classes on the basis of criteria wholly

unrelated to the objective of the statute.

92. A classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly situated are treated in the same manner. The Registrar has unlawfully violated Plaintiff's and other voters' Constitutional rights by differentiating treatment against otherwise similarly situated property owners on the basis of wealth, age, and disability.

93. There exists a justiciable and triable dispute and controversy between the parties which is ripe for adjudication. Plaintiff contends that the Registrar's action, or inaction, is invalid and void as violating equal protection of the law, denying Plaintiffs procedural due process and substantive due process. Plaintiff is informed and believes, and on this basis alleges, that the Registrar denies such contention and contends otherwise. A declaratory judgment is appropriate and necessary, to avoid the potential of multiplicity of actions, to prevent irreparable harm, to ensure proper enforcement of the law, and to resolve a matter of public interest.

94. It is a matter of historical record that responsible, prudent governments have postponed elections that were scheduled to take place when emergencies struck. Residents of New York City were just starting to vote in the city's mayoral primary when the Twin Towers of the World Trade Center were attacked by terrorists on September 11, 2001. New York City stopped the election in progress and held the primary two weeks later. Here, the San Joaquin County Registrar had the right granted by the Governor to extend the certification of an election impacted by a pandemic, and was instructed to "provide maximum possible notice to voters about how to participate in each of these elections," and chose to disenfranchise voters instead.

95. Hurricane Katrina destroyed much of New Orleans in late August 2005, and more than five months later, the city postponed its first round of mayoral voting, originally scheduled for February 4, 2006, so it could continue to deal with the devastation left in Katrina's wake.

New Orleans ultimately held the mayoral primary on April 22, 2006. Here, the San Joaquin County Registrar had the right granted by the Governor to extend the certification of an election impacted by a pandemic and chose to disenfranchise voters instead.

96. The United States Supreme Court has established a test, called "Anderson/Burdick Balancing," to guide lower federal courts' decision making in challenges to state election law, regardless of the underlying legal theory used to support the challenge. This Court must weigh the character and magnitude of the injury to the plaintiffs' First and Fourteenth Amendment rights against the precise interests put forward by the state as justifications for restricting the right to vote, in light of the extent to which those state interests make it necessary to impair the plaintiffs' right to vote.

97. Plaintiff has no adequate remedy at law and may suffer irreparable injury absent injunctive relief. A preliminary and permanent injunction should issue prohibiting Defendants from proceeding with the run-off election in November until the Registrar accepts and counts the ballots of the Class Members and thereafter re-certifies the election results.

**SECOND CLAIM FOR RELIEF**

**Violation of Voters Rights Act (As Amended)**

**42 U.S.C. §1983**

98. Plaintiff hereby realleges and incorporates each and every allegation contained in each of the foregoing paragraphs of the complaint as though fully set forth herein.

99. California has a centuries-long history of discrimination against African Americans and Latinos that has interfered with their ability to participate in registration and voting. This history dates back to the State's founding.

100. These election conditions violate Section 2 of the Voting Rights Act, 52 U.S.C. § 10301,

because they result in a denial and abridgment of the right to vote on account of race and

language minority, as well as age and disability, in that, under the totality of the circumstances,

Plaintiffs and minority voters are denied an equal opportunity to participate effectively in the

political process.

101. Voting is a fundamental right guaranteed by the U.S. Constitution as the United

States Supreme Court told us long ago in Reynolds v. Sims, 477 U.S. 533 (1964):

> Undeniably the Constitution of the United States protects the right **of all qualified**
>
> **citizens** to vote, in state as well as in federal elections. A consistent line of
>
> decisions by this Court in cases involving attempts to deny or restrict the right of
>
> suffrage has made this indelibly clear. It has been repeatedly recognized that **all**
>
> **qualified voters have a constitutionally protected right to vote**, *Ex parte*
>
> *Yarbrough*, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274, and **to have their votes**
>
> **counted**, *United States v. Mosley*, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355. In
>
> *Mosley* the Court stated that it is 'as equally unquestionable that the right to have
>
> one's vote counted is as open to protection . . . as the right to put a ballot in a box.'
>
> 238 U.S., at 386, 35 S.Ct., at 905. **The right to vote can neither be denied**
>
> **outright**, *Guinn v. United States*, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340,
>
> *Lane v. Wilson*, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281, nor destroyed by
>
> alteration of ballots, see *United States v. Classic*, 313 U.S. 299, 315, 61 S.Ct.
>
> 1031, 1037, 85 L.Ed. 1368, nor diluted by ballot-box stuffing *Ex parte Siebold*,
>
> 100 U.S. 371, 25 L.Ed. 717, *United States v. Saylor*, 322 U.S. 385, 64 S.Ct. 1101,
>
> 88 L.Ed. 1341. As the Court stated in *Classic*, 'Obviously included within the
>
> right to choose, secured by the Constitution, **is the right of qualified voters**

**within a state to cast their ballots and have them counted** . . . .'313 U.S., at 315, 61 S.Ct., at 1037. Racially based gerrymandering, *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110, and the conducting of white primaries, *Nixon v. Herndon*, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759, *Nixon v. Condon*, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984, *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152, both of which result in denying to some citizens their right to vote, have been held to be constitutionally impermissible.

\* \* \*

Undoubtedly, the right of suffrage is a **fundamental matter** in a free and democratic society. Especially since the right to exercise the franchise in a **free and unimpaired** manner is preservative of other basic civil and political rights, **any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized**. Almost a century ago, in *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, the Court referred to '**the political franchise of voting' as 'a fundamental political right, because preservative of all rights**.' 118 U.S., at 370, 6 S.Ct., at 1071. Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests. As long as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and directly representative of the people, the right to elect legislators in a free **and unimpaired** fashion is a bedrock of our political system.

102. The Defendants understood the dangers of COVID-19 presented during the Primary

Election and cavalierly (and for clearly political reasons) refused to take action to accept the

modified deadlines to certify the election granted by the Governor, which decision runs counter

to every credible public health pronouncement about COVID-19 in the United States and

the direction of doctors, scientists, epidemiologists, virologists, infectious disease specialists, and

public health experts by which clearly recognize normal activities have impacted voters ability to

cure their vote (even if we assume that voters were notified to cure by the Registrar).

103. San Joaquin County voters deserve orderly process and procedures to cure their vote this

year that do not obligate them to choose between risking (or being terrified for) their lives

(guaranteed against State interference to each of them pursuant to the Fourteenth Amendment of

the U.S. Constitution) and their fundamental right to vote, which since the Supreme Court's 1886

decision in *Yick Wo* has been recognized as a fundamental element of citizenship for all qualified

citizens in the United States. Because there is no compelling justification or rational basis for

ALEX PADILLA, in his official capacity as Secretary of State for the State of California;

MELINDA DUBROFF, in her official capacity of the San Joaquin County Registrar of Voters

not to follow the Governor of California's Executive Order allowing for an extension of all

canvassing, certification time periods if disruptions are present related to the pandemic.

103. On December 31, 2019, medical officials in Wuhan City, Hubei Province of  China

("Wuhan") reported to the China Country Office of the World Health Organization

("WHO") about cases of pneumonia with unknown cause. Within four days, Wuhan had a total

of 44 patients fitting this description. By January 7, 2020, Chinese authorities had isolated the

disease as a novel coronavirus. The term "coronavirus" applies to a large group of viruses that

cause disease in animals and humans. They often circulate among camels, cats, and bats.

Sometimes they evolve and affect human beings. WHO named the novel coronavirus "COVID-

19" on February 11, 2020 and we use that term in this Complaint to refer to the disease giving rise to the current global pandemic affecting California.

104. On January 20, 2020, a 35-year old man from Seattle, Washington was diagnosed with COVID-19, the first such case identified in the United States. In its first "Situation Report" a day later, WHO informed that there were 282 known cases of COVID-19 worldwide; most of those cases were in various Chinese provinces but a few others existed in Japan, Korea, and Thailand. The Seattle case obviously had just entered the data set and did not make WHO's first published report. By the time of WHO's publication, six individuals had died of COVID-19. On January 30, 2020, WHO declared COVID-19 a Public Health Emergency of International Concern.

105. COVID-19 took off like a rocket.  By March 11, 2020, WHO reported that there were more than 118,000 cases of the disease worldwide in at least 110 countries and territories, with great concern about a sustained risk of global spread. That day, WHO classified COVID-19 as a pandemic, which the U.S. Centers for Disease Control ("CDC") defines as follows:

> Pandemics happen when new (novel) . . . viruses emerge which are able to infect people easily and spread from person to person in an efficient and sustained way. Because the virus is new to humans, very few people will have immunity against the pandemic virus, and a vaccine might not be widely available. The new virus will make a lot of people sick. How sick people get will depend on the characteristics of the virus, whether or not people have any immunity to that virus, and the health and age of the person being infected.

CDC Website, accessed on Apr. 11, 2020 at https://www.cdc.gov/flu/pandemicresources/

basics/index.html.

106. Dr. Tedros Adhanom Ghebreyesus, WHO Director-General, said at the time of the

pandemic declaration: "This is not just a public health crisis, it is a crisis that will touch every

sector. So, every sector and every individual must be involved in the fights." Jamie Ducharme,

"World Health Organization Declares COVID-19 a 'Pandemic:' Here's What That Means,"

Time, March 11, 2020, accessed on April 11, 2020 at https://time.com/5791661/whocoronavirus-

pandemic-declaration/. COVID-19 is a disease that spreads exponentially and has demonstrated

its ability to transmit easily among the population, often without detection, with the ability to

wreak havoc on healthcare resources throughout the world. For these reasons (and others), on

March 4, 2020, California Governor Gavin Newsom declared a public health emergency to direct

all resources needed to respond to and contain COVID-19 in California. Then on March 13, 2020,

President Donald J. Trump declared a National Emergency concerning

the pandemic.

107. New cases and deaths are climbing exponentially on a daily basis. The data being

exchanged by scientists and medical professionals are largely incomplete and likely understate

the number of people who are and have been infected with COVID-19, because a large number

of individuals who have the disease are believed to be asymptomatic. For example, the Centre

for Evidence-Based Medicine at Oxford University in England studied the proportion of

COVID-19 carriers who were either entirely asymptomatic or presenting mild symptoms and

concluded that between 5 and 80 percent of people testing positive for the disease may be

asymptomatic. See Carl Heneghan, Jon Brassey, and Tom Jefferson, COVID-19: What

Proportion are Asymptomatic, Centre for Evidence Based Medicine, accessed on April 11, 2020

at https://www.cebm.net/covid-19/covid-19-what-proportion-are-asymptomatic/. For example,

18 percent of those who tested positive for COVID-19 on the Diamond Princess Cruise showed no symptoms, as did 57 percent of the residents at the King County, Washington long-term care facility where the disease first took hold in the United States. Whether the number of asymptomatic individuals is on the low range (five percent) or the high range (80 percent), it is quite clear that many people are carrying COVID-19 without knowing it. The result is that hundreds of thousands of people around the world are presently ensuring the continuing spread of this disease.

108. With full knowledge of the medical confusion on who is carrying the disease in California, how easily it transmits from person to person, and the deadly and seemingly random nature of COVID-19, the Defendants nevertheless intentionally chose to shirk their oaths of office, to enable voters to cure their votes in the Presidential Primary Election. The Defendants named in this Complaint who were charged with running and administering the Presidential Primary Election on its behalf, frustrated a segment of San Joaquin County citizen's ability to cure their vote amidst the first pandemic of this scale since the 1918 influenza that killed approximately 50 million people worldwide. This is remarkable, as 18 other states and territories (Alaska, Connecticut, Delaware, Georgia, Hawaii, Indiana, Kentucky, Louisiana, Maryland, Montana, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, West Virginia, Wyoming, and Puerto Rico) deemed it reasonable and necessary to literally postpone or alter the approach to their spring elections because of the risk to public health due to the COVID-19 situation.

109. This relief must be granted to ensure that voters rights are not abridged in future elections in 2020 while the pandemic runs its course.

**THIRD CLAIM FOR RELIEF**

**Declaratory and Injunctive Relief Based on Constitutional Provisions Requiring**

30

**Procedural and Substantive Due Process of the Law**

**(42 U.S. Code § 1983-Civil action for deprivation of rights)**

110. Plaintiff hereby realleges and incorporates each and every allegation contained in each of the foregoing paragraphs of the complaint as though fully set forth herein.

111. The Registrar's conduct is substantively unreasonable, irrational, arbitrary and/or capricious and lacking any real and substantial relation to the object sought to be obtained, and violates procedural and substantive due process of the law.

112. The Registrar failed to provide sufficient justification for denying voter's their opportunity to cure their signatures, and failed to provide voters with sufficient notice and instruction on how and when to cure their votes, thus effectively denying Plaintiffs and other voters the right to vote, which necessarily includes having their vote counted.

113. Under the law of the Ninth Circuit, a 42 U.S. Code § 1983 claim alleging a procedural due process denial requires proof of three elements: (1) a deprivation of a constitutionally protected liberty interest; (2) a state action; and (3) constitutionally inadequate process.

114. In this case, the first element is the constitutionally protected right to vote and have your vote counted. The second element is state action by the defendant (San Joaquin County Registrar) failing and refusing to count vote-by-mail ballots that were lawfully cast in the March 3, 2020 primary. The third element was a defective notice sent to vote-by-mail voters by the defendant as to how and when to cure their vote which did not give a meaningful notice to enable voters to cure. Courts around the country have recognized that "[w]hile it is true that absentee voting is a privilege and a convenience to voters, this does not grant the state the latitude to deprive citizens of due process with respect to the exercise of this privilege." *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990); see also *Zessar v. Helander*, No.

05 C 1917, 2006 WL 642646, at *6 (N.D. Ill. 2006) ("approved absentee voters are entitled to due process protection."). Having created an absentee voter regime through which qualified voters can exercise their fundamental right to vote, the State must now provide these voters with constitutionally adequate due process protection.

115. The remaining question is whether California's vote-by-mail statutes provides adequate process. See *Grayden*, 345 F.3d at 1232. "To determine what process is due, courts turn to the test from *Mathews v. Eldridge*, which requires the balancing of a number of considerations:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Hansen I,* 736 F.3d at 966 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). In addition, the Mathews Court implored courts to recognize that "procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." (*Id*. 424 U.S. at 344.)

116.  The fundamental requirement of due process is an opportunity to be heard upon such notice and proceedings as are adequate to safeguard the rights for which the constitutional protection is invoked. (*Anderson Nat'l Bank v. Luckett*, 321 U.S. 233 (1944)  Procedural due process rights are violated by a failure to provide adequate notice of the right to challenge the deprivation of the right as well as the procedures to implement the right, particularly including of the time periods to challenge. (*Brody v. Village of Port Chester* (2d Cir. 2005) 434 F.3d 121 (*Brody*; *People v.

*Swink* (1984) 150 Cal. App. 3d 1076 [forfeiture reversed where party was denied procedural due process in that the notice she received was not reasonably calculated to inform her of the statutory procedural scheme to obtain a discharge, <u>especially the governing jurisdictional period</u> of limitations.) The courts and law must give "due regard for the practicalities and peculiarities of the case" in determining the reasonableness of the notice given. (*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Harris v. County of Riverside* (9th Cir. 1989) 904 F.2d 497.)

117.  Here, giving "due regard for the practicalities and peculiarities of the case" means considering whether the procedures employed were reasonably calculated to protect the voters' rights in light of the pandemic, the shelter-in-place orders, the closure of the Registrar's Office, the misinformation on the website, and the orders of the Governor and Secretary of State, the inadequacy of the notice the Registrar sent to voters and all other relevant circumstances.

118.  The notices sent by the Registrar to voters did not provide adequate procedural due process in that they did not inform voters of the deadline to submit their cure affidavits, the Registrar's website presented misleading information as to the deadline for submission, the dropbox at the Registrar's Office told voters not to drop off cure affidavits after election day, and any voters who knew of the normal deadline to certify election results and researched the question would likely have learned of the Governor and the Secretary of State's instructions to extend the time for certification by 21 days.

119.  The actions and inactions of the Registrar also have deprived voters of equal protection of the laws.  Some voters who submitted affidavits after the Registrar's arbitrary date to certify the election had their votes counted, others did not.  These voters were similarly situated but were provided radically different legal results - some had their votes counted - some were depried of

the right to vote.  The same is true comparing these voters to other mail-in voters in other

Counties who needed to cure deficiencies in their ballot submissions where other Counties

extended the time for certification of the election to dates later than the April 5 date which the

San Joaquin County Registrar chose to certify election results.  This too denies San Joaquin

voters equal protection.

120.  There exists a justiciable and triable dispute and controversy between the parties

which is ripe for adjudication. Plaintiff contends that the Registrar's conduct is invalid and void

as violating due process of the law. Plaintiff is informed and believes, and on this basis alleges,

that the Registrar denies such contention and contends otherwise. A declaratory judgment is

appropriate and necessary, to avoid the potential of multiplicity of actions, to prevent irreparable

harm, to ensure proper enforcement of the law, and to resolve a matter of public interest.

121. Plaintiff has no adequate remedy at law and may suffer irreparable injury absent

injunctive relief. A preliminary and permanent injunction should issue prohibiting Defendant

from denying voters the right to vote by refusing to tabulate those votes which were timely

verified.

122. Plaintiff has no plain, speedy or adequate remedy in the ordinary course of law.

This court should issue an injunction requiring the Registrar to count votes of those who

delivered cure affidavits on or before April 21, 2020, consistent with the Governor's executive

order and the Secretary of State's memorandum and thereafter re-certify the election results.

**FOURTH CLAIM FOR RELIEF**

**Violation of the Americans with Disabilities Act 42 U.S.C. § 12131 *et seq*.**

123.  Plaintiff hereby realleges and incorporates each and every allegation contained in each of

the foregoing paragraphs of the complaint as though fully set forth herein.

34

124. Voting is one of our nation's most fundamental rights and a hallmark of our democracy. Yet for too long, people with disabilities have been excluded from this core aspect of citizenship. People with intellectual or mental health disabilities have been prevented from voting because of prejudicial assumptions about their capabilities. People who use wheelchairs or other mobility aids, such as walkers, have been unable to enter the polling place to cast their ballot because there was no ramp. People who are blind or have low vision could not cast their vote because the ballot was completely inaccessible to them.

125. Invaluable federal civil rights laws have been enacted to combat such forms of discrimination against those with disabilities and to protect the fundamental right to vote for all Americans. These laws include: The Americans with Disabilities Act (the "ADA"); The Rehabilitation Act of 1973 (the "Rehabilitation Act"); the VRA; the Voting Accessibility for the Elderly and Handicapped Act of 1984 (the "VAEHA"); the National Voter Registration Act of 1993 ("NVRA"); and the Help America Vote Act of 2002 (the "HAVA").

124. This action is brought by Plaintiffs to enforce Title II of the ADA, 42 U.S.C. §§ 12131-12134, and its implementing regulation, 28 C.F.R. Part 35, against ALEX PADILLA, in his official capacity as Secretary of State for the State of California; MELINDA DUBROFF, in her official capacity of the San Joaquin County Registrar of Voters to follow the Governor of California's Executive Order allowing for an extension of all canvassing, certification time periods if disruptions are present related to the pandemic.

126. Public entities must ensure that they do not have policies, procedures, or practices in place that interfere with or prohibit persons with certain disabilities from registering to vote or voting based on their disability. For example, an election official cannot refuse to provide an absentee ballot or voter registration form to a person with a disability because the official knows the voter

35

resides in a nursing home.

127. In addition, the laws require public entities to modify their voting policies, practices, and procedures when such modifications are necessary to avoid discrimination on the basis of a voter's disability.

128. At all relevant times hereto, upon information and belief, Defendants intentionally, with malice and reckless indifference of the Plaintiffs seeking protection of the ADA, violated the ADA and Rehabilitation Act by refusing to accommodate their disabilities to allow them to cure their vote-by-mail, despite knowing that the ADA and Rehabilitation Act required such accommodations.

129. At all relevant times hereto, upon information and belief, Plaintiffs had to retain legal counsel to bring this action and as such according to the ADA and the Rehabilitation Act the below identified attorneys shall be entitled to fair and reasonable attorneys' fees and costs incurred in bringing this action under the ADA.

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for relief as follows:

1. That this Court grant declaratory relief to Plaintiffs determining that they have been denied their right to vote by the action and inaction of the Registrar.

2. That this Court issue of an Injunction, enjoining MELINDA DUBROFF, in her official capacity of the San Joaquin County Registrar of Voters, to immediately count and accept 1) the identified thirty-five (36) vote's in the California Assembly District 13 of San Joaquin County which were timely voted by mail in the March 3, 2020, Respondents Presidential Primary Election and that have signed affidavits and turned said affidavits into the San Joaquin County Registrar's Office verifying their signatures for the vote they cast before 5:00 p.m. on April 21st,

2020, 2) the additional eleven cure affidavits received by the Registrar on April 13, 2020, before the extended deadline for said cure granted by the Governor's Emergency Executive Order and 3) the additional votes found during the recount before it was discontinued.

3.  That the Court further order that, after counting the required votes, if the count changes the election outcome, the Registrar notify the Secretary of State of the changed outcome and the Secretary of State thenre-certify the election.

4. Ordering fair, reasonable, and constitutionally sufficient procedures governing the future 2020 elections so as to allow Plaintiffs and all members of the Class to safely participate in those elections without concerns over COVID-19;

5. Imposing all other preliminary, permanent, declaratory, ancillary, and supplemental relief as alleged herein or otherwise pursued in this action;

6. Certifying each and every Class and Sub-Class as defined in this Amended Complaint or hereafter established pursuant to Fed. R. Civ. P. 23;

7. Appointing the undersigned as Class counsel under Fed. R. Civ. P. 24(g);

8. For attorney's fees incurred pursuing this relief,

9. For costs of suit incurred herein; and

10. For such other and further relief which the Court deems just and proper.


Date: June 30, 2020

/s/ Allen Sawyer

_____

Allen Sawyer
Attorney for Plaitiffs

//

37

//

VERIFICATION

I, CHRISTINA FUGAZI, declare,

1.      I am a named Plaintiff in the above-entitled Complaint for Injunctive and other

relief.

2.      I have read the above First Amended Complaint and know the contents thereof

and the same are true of my knowledge.

3.      I declare the above to be true under penalty of perjury under the laws of the State

of California.

Signed this 30th day of June, 2020

at Stockton, California


            /s/ *Christina Fugazi*

            "original signature retained by attorney Allen Sawyer"

            _____

            CHRISTINA FUGAZI